**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

TOWN OF WESTPORT and
WESTPORT COMMUNITY SCHOOLS,
*Plaintiffs*,

v.

MONSANTO COMPANY,
SOLUTIA INC., and
PHARMACIA CORPORATION,
*Defendants*

---

**PLAINTIFFS' ORIGINAL COMPLAINT**

---

## I.    INTRODUCTION

1.    Plaintiffs Town of Westport ("Town") and Westport Community Schools ("Westport")
operate public schools and buildings in Westport, Massachusetts.  Westport has detected
toxic chemical compounds known as polychlorinated biphenyls ("PCBs") in one or more
of its buildings.

2.    PCBs are man-made organic chemical compounds that were used in hundreds of
industrial and commercial applications in the United States.  Among other uses, PCBs
were incorporated into building products including electrical equipment, fluorescent
lighting ballasts, paints, sealants, and caulks that were used in the construction of
commercial and school buildings.

1

3.   PCBs cause a variety of adverse health effects.  PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.

4.   PCBs easily escape into the atmosphere when they are produced and through the normal, intended uses of products that contain PCB compounds.  As a result, PCBs are a near global environmental contaminant.  To stem the contamination, to prevent health risks associated with exposure to PCBs, and for other reasons, Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

5.   The Plaintiffs seek damages for the costs of investigating, removing toxic PCB compounds, and remediating all PCB contamination from their school buildings and properties.

## II.   PARTIES

6.   Westport is a school district that operates public schools in the Town of Westport.  The district has detected PCBs in one or more of its school buildings.  In Massachusetts, a school district is a body politic with the power to sue and be sued as provided by Mass. G.L. ch. 71, § 16.  School districts are authorized to construct, maintain, renovate, remodel, and repair school buildings.  *Id*.

7.   The Town has a property interest in buildings used by the school district as schools.  The Town also has the financial obligation for investigation and remediation activities conducted at school buildings.   A town may sue and be sued as provided by Mass. G.L. ch. 40, § 2.

8.   Plaintiffs are located in Westport, Massachusetts.

2

9. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

10. Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

11. Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to Old Monsanto) is a Delaware LLC with its principal place of business in Peapack, New Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

12. The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceuticals and nutrition business, and a chemical products business. Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

13. Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.  The corporation now known as Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

14. Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business.  Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[1]

15. Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have

---

[1] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013);  see also Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).

entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[2]

16. In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[3]

17. Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

## III. JURISDICTION AND VENUE

18. This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiffs and Defendants. Each Plaintiff is a citizen of Massachusetts, but no Defendant is a citizen of Massachusetts. Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri. Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri. Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

19. Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

---

[2] *See id.*
[3] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

## IV.     FACTUAL ALLEGATIONS

### A.  Monsanto Manufactured PCBs for Use in the United States Until the 1979 Ban.

20.     Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached

        to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single,

        unique chemical compound in the PCB category.  Over two hundred congeners have been

        identified.[4]

21.     PCBs were generally manufactured as mixtures of congeners.  These were both

        intentionally produced as commercial products, and incidentally produced as byproducts

        of other manufacturing processes.  From approximately 1935 to 1979, Monsanto

        Company was the only manufacturer in the United States that intentionally produced

        PCBs for commercial use.[5]  The most common trade name for PCBs in the United States

        was "Aroclor," which was trademarked by Old Monsanto.

22.     Before 1979, Monsanto's commercially-produced PCBs were used in a wide range of

        industrial applications in the United States.  Products containing PCBs were widely used

        in the construction and renovation of buildings throughout the United States.

23.     Some PCB-containing products were used in applications that enclosed the PCBs

        completely within the equipment such as transformers, motor start capacitors, and

        lighting ballasts.  These are generally known as "totally enclosed" uses.

24.     Other PCB-containing products were used in applications in which the PCBs were not

        enclosed --- e.g., caulks, paints, and sealants.  These are known as "non-totally enclosed"

---

[4] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).
[5] See 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. . . . .").  See also MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

uses because no physical barrier prevents PCBs from direct contact with the surrounding environment.

25.   Between approximately 1950 and 1979, PCBs were widely and foreseeably used in the construction and renovation of commercial buildings and schools.  Accordingly, PCBs are likely to be present in any number of materials present in a school built or renovated during this period, including paint, caulk, fluorescent light ballasts, and other materials.

26.   In response to widespread environmental contamination, Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

27.   As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

   **B.  PCB-Containing Materials Cause Contamination and Property Damage.**

28.   PCBs easily migrate from non-totally enclosed building materials (such as caulk) into surrounding materials such as masonry, wood, drywall, and soil, thereby causing damage to those surrounding materials.  PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials.

29.   The Environmental Protection Agency ("EPA") conducted research of PCBs in school buildings and confirmed that emissions from caulk and fluorescent light ballasts cause elevated PCBs in the surrounding air.

30.    EPA concluded that some building materials (*e.g.*, paint and masonry walls) and indoor dust can absorb PCB emissions and become potential secondary sources of contamination that begin emitting PCBs on their own.

### C.  PCB Exposure and Toxicity

31.    PCBs can enter the human both through ingestion, inhalation, and dermal contact.

32.    Children, teachers, and employees who work in school buildings may inhale PCBs that are emitted into the air from caulk, paint, light ballasts, and other secondary sources. They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks.  And they may absorb PCBs from physical contact with PCB-containing materials, secondary sources, or surfaces that have become contaminated by air or dust.

33.    Any exposure is a concern to a reasonable school district because PCBs are associated with serious health risks.

34.    EPA has determined that Monsanto's PCBs are probable human carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260. [6]  EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

35.    In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects

---

[6] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

on the immune system, the reproductive system, the nervous system, and the endocrine system.

36.   PCBs affect the immune system by causing a significant decrease in the size of the thymus gland, lowered immune response, and decreased resistance to viruses and other infections.  The animal studies were not able to identify a level of PCB exposure that did not affect the immune system.  Human studies confirmed immune system suppression.

37.   Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs.  Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

38.   Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

39.   PCBs may also disrupt the normal function of the endocrine system.  PCBs have been shown to affect thyroid hormone levels in both animals and humans.  In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing.  PCB exposures have also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

40.   PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

41.    Children may be affected to a greater extent than adults.  The Agency for Toxic
       Substances and Disease Registry explained:  "Younger children may be particularly
       vulnerable to PCBs because, compared to adults, they are growing more rapidly and
       generally have lower and distinct profiles of biotransformation enzymes, as well as much
       smaller fat deposits for sequestering the lipophilic PCBs."[7]

       **D.  Monsanto's Knowledge of PCB Toxicity**

42.    Monsanto's internal documents show that Monsanto knew that PCBs were toxic as early
       as the 1930s.

43.    An October 11, 1937, memorandum advises that "Experimental work in animals shows
       that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated
       oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid
       Aroclors may lead to an acne-form skin eruption."[8]

44.    A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with
       respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been
       precisely defined.  It does not make too much difference, it seems to me, because our
       main worry is what will happen if an individual develops [*sic*] any type of liver disease
       and gives a history of Aroclor exposure.  I am sure the juries would not pay a great deal
       of attention to [maximum allowable concentrates]."[9]

45.    On November 14, 1955, Monsanto's Medical Department provided an opinion that
       workers should not be allowed to eat lunch in the Aroclor department:

              It has long been the opinion of the Medical Department that eating
              in process departments is a potentially hazardous procedure that

---

[7] Agency for Toxic Substances and Disease Registry, Toxicological Profile for Polychlorinated Biphenyls (PCBs), (November 2000), at 405, available at www.atsdr.cdc.gov (last accessed May 1, 2014).
[8] MONS 061332, attached as Exhibit B.
[9] MONS 095196-7, attached as Exhibit C.

could lead to serious difficulties.  While the Aroclors are not
particularly hazardous from our own experience, this is a difficult
problem to define because early literature work claimed that
chlorinated biphenyls were quite toxic materials by ingestion or
inhalation.[10]

46.    On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S.

Navy decided against using Monsanto's Aroclors:  "No matter how we discussed the

situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for

use in a submarine."[11]

47.    On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum discussing

a recent article that criticized PCBs as a "toxic substance" and "uncontrollable

pollutant."[12]  Richard explained that Monsanto could take steps to reduce PCB releases

from its own plants but cautioned, "It will be still more difficult to control other end uses

such as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to

consumers is greater and the disposal problem becomes complex."

48.    On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo

titled "Defense of Aroclor."[13]  He advised that the company could not defend itself

against all criticism:  "We can't defend vs. everything.  Some animals or fish or insects

will be harmed.  Aroclor degradation rate will be slow.  Tough to defend against.  Higher

chlorination compounds will be worse [than] lower chlorine compounds.  Therefore we

will have to restrict uses and clean-up as much as we can, starting immediately."[14]

---

[10] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as
Exhibit D.
[11] MONS 095640, attached as Exhibit E.
[12] MONS 096509-096511, attached as Exhibit F.
[13] DSW 014256-014263, attached as Exhibit G.
[14] *Id.*

49.   On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory reports discussing results of animal studies.  He noted:  "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated.  Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[15]

50.   Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc in a PCB Presentation to Corporate Development Committee.  The report suggests possible reactions to the contamination issue.  It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint."  But the option of going out of the Aroclor business was also considered unacceptable:  "there is too much customer/market need and selfishly too much Monsanto profit to go out."[16]

51.   The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969.  The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[17]  The meeting minutes acknowledge that PCB-containing products rapidly contaminate the environment:  "In one application alone (highway paints), one million lbs/year are used.  Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[18]

52.   A month later, on October 2, 1969, the Committee reported that it could not protect the environment from Aroclors as "global" contaminants but could protect the manufacture and sale of Aroclors:

---

[15] MONS 098480, attached as Exhibit H.
[16] MONS 058730-058753, at 058737, attached as Exhibit I.
[17] MONS 030483-030486, attached as Exhibit J.
[18] *Id*.at 030485.

11

> There is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.
>
> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination.  There are, however a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.[19]

53.   An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260:  "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment."  Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business."  To that end, it says, "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new products] when available.  He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system.  We don't want to take fluid back."[20]

54.   In 1970, the year after Monsanto formed the "ad hoc" committee, PCB production in the United States peaked at 85 million pounds.

### E.  Legal and Regulatory Standards Applicable to PCBs

55.   Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

---

[19] DSW 014612-014624, at 014615, attached as Exhibit K.
[20] MONS 100123-100124, attached as Exhibit L.

56. More than thirty years passed before EPA announced that schools may have been built with PCB-containing materials.  In a press release issued on September 25, 2009, EPA advised that although PCBs were banned by 1979, they remained in place in buildings that were constructed before the ban.[21]

57. On December 12, 2013, EPA issued a press release advising that PCB-containing fluorescent light ballasts that were installed prior to the ban may still be in use in schools and may leak PCBs.[22]

58. EPA has not issued any information regarding possible PCB contamination in schools in Massachusetts.

59. The Massachusetts Department of Environmental Protection has not issued any information regarding possible PCB contamination in schools in Massachusetts.

**F.    Plaintiffs' Schools are Contaminated with PCBs.**

60. Plaintiff Westport operates a public school system in the Town of Westport, Massachusetts.  Westport has detected PCBs in one or more of its schools that were built or renovated between 1950 and 1978.  In May 2011, dangerous levels of PCBs were detected at Westport Middle School, necessitating removal and remediation.

**FIRST CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
DEFECTIVE DESIGN**

61. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding

---

[21] Press Release, *EPA Announces Guidance to Communities on PCBs in Caulk of Buildings Constructed or Renovated Between 1950 and 1978* (September 25, 2009), available at http://yosemite.epa.gov/opa/admpress.nsf/e51aa292bac25b0b85257359003d925f/28c8384eea0e67ed8525763c0059342f!OpenDocument&Highlight=0,PCB (last accessed February 24, 2014).

[22] Press Release, *EPA Provides Updated Guidance to Schools on PCB-containing Lighting Fixtures* (December 12, 2013), available at http://yosemite.epa.gov/opa/admpress.nsf/e51aa292bac25b0b85257359003d925f/2e548f3ed779c8a085257c3f006147ad!OpenDocument&Highlight=0,PCB#area (last accessed February 24, 2014).

paragraphs as if fully restated in this cause of action.

62.   Monsanto was a manufacturer of PCBs and PCB products produced for commercial use. Monsanto was in the business of producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing PCBs and PCB-containing products for placement into trade or commerce.

63.   Monsanto's PCB products, including fluorescent light ballasts, caulks, and paints, were manufactured for placement into trade or commerce.

64.   Monsanto's PCB products may have formed component parts of or may have been subsequently incorporated into other products, equipment, or improvements to real property.

65.   As a manufacturer, Monsanto owed a duty to all persons to whom PCBs and PCB-containing products might foreseeably harm, including Plaintiffs, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

66.   By manufacturing and selling PCBs, Monsanto warranted that PCBs are merchantable, safe, and fit for ordinary purposes.

67.   Monsanto breached that warranty as PCBs and PCB-containing products are unreasonably dangerous for their reasonably anticipated use in school buildings for the following reasons:

    a.   PCB-containing products were used to construct commercial buildings and schools throughout Massachusetts, including Plaintiffs';

    b.   PCB readily migrates from the site of its original application and contaminates adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

    c.   PCB persists in the environment;

    d.  PCB is invisible to the naked eye;

    e.  Children and teachers may be exposed to PCB through inhalation, ingestion, and dermal contact.

    f.  PCB is a known animal carcinogen and a possible human carcinogen and is associated with other serious health risks;

    g.  PCB exposure may be prevented only physical removal of the original PCB products and any secondary materials that have become contaminated;

    h.  Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

68.   Monsanto knew of the risks associated with PCBs and failed to use reasonable care in the design of its products.

69.   Products containing PCBs pose greater dangers to school buildings than would be expected by ordinary persons such as Plaintiffs, schoolchildren, teachers, and employees, and the general public.

70.   There existed an alternative design for Monsanto's products that was capable of preventing the Plaintiffs' damage.

71.   The risks posed by PCBs and PCB products outweigh the products' utility as building materials.

72.   The likelihood that PCBs would contaminate Plaintiffs' property and the gravity of that damage outweighed any burden on Monsanto to adopt an alternative design and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

73.  As a direct and proximate result of Monsanto's unreasonably dangerous design, manufacture, and sale of PCB-containing products, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

74.  Monsanto knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties. Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

## SECOND CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY FAILURE TO WARN

75.  Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

76.  As a manufacturer of PCBs and PCB-containing products, Monsanto had a duty to provide adequate warnings to Plaintiffs, the public, and public officials of the risks posed by PCBs and PCB-containing products.

77.  PCBs and PCB-containing products are unreasonably dangerous for their reasonably anticipated use in school buildings for the following reasons:

   a.  PCB-containing products were used to construct commercial buildings and schools throughout Massachusetts, including Plaintiffs';

   b.  PCB readily migrates from the site of its original application and contaminates adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

   c.  PCB persists in the environment;

    d.   PCB is invisible to the naked eye;

    e.   Children and teachers may be exposed to PCB through inhalation, ingestion, and dermal contact;

    f.   PCB is a known animal carcinogen and a possible human carcinogen and is associated with other serious health risks;

    g.   PCB exposure may be prevented only by physical removal of the original PCB products and any secondary materials that have become contaminated;

    h.   Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

78.    Monsanto knew of the risks associated with PCBs and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with PCB-containing products or an instruction that would have allowed Plaintiffs to avoid the damage to their property.

79.    Despite Monsanto's knowledge of the presence of PCB-containing products in commercial buildings and schools nationwide, Monsanto has not issued any warning, instruction, recall, or advice regarding PCB-containing products to schools, communities, parents, or governmental agencies.

80.    Plaintiffs would have heeded legally adequate warnings and would not have purchased products containing PCBs or would have taken steps to ensure that PCBs were treated differently to prevent potential exposure and contamination of the environment.

81.     As a direct and proximate result of Monsanto's failure to warn, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

### THIRD CAUSE OF ACTION

### NEGLIGENCE

82.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

83.     As a manufacturer and seller of PCBs, Monsanto owed a duty to Plaintiffs and to all persons whom its products might foreseeably harm to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PCBs and products containing PCBs.

84.     Monsanto knew or should have known that:

     a.   PCB-containing products were used to construct commercial buildings and schools throughout Massachusetts, including Plaintiffs';

     b.   PCB readily migrates from the site of its original application and contaminates adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

     c.   PCB persists in the environment;

     d.   PCB is invisible to the naked eye;

     e.   Children and teachers may be exposed to PCB through inhalation, ingestion, and dermal contact;

     f.   PCB is a known animal carcinogen and a possible human carcinogen and is associated with other serious health risks;

g. PCB exposure may be prevented only physical removal of the original PCB products and any secondary materials that have become contaminated;

h. Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

85. Monsanto breached its duty of care to Plaintiffs by:

a. Formulating, designing, manufacturing and selling PCBs for use in school buildings;

b. Manufacturing, selling, promoting, and defending the continued manufacture and sale of PCBs without disclosing the risks associated with exposure to PCBs;

c. Failing to restrict sales of PCB products to avoid risks of exposure at schools;

d. Failing to advise school districts about the presence of PCBs in products including caulk and light ballasts;

e. Failing to inspect and/or test for the presence of PCBs in products in school buildings, including but not limited to caulk and light ballasts;

f. Failing to warn the public, regulators, and school districts about the continued presence of PCBs in construction materials used during the relevant time period; and

g. Failing to make any attempt to remove PCB-laden materials from schools.

86. As a direct and proximate result of Monsanto's negligence, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

## FOURTH CAUSE OF ACTION

### PUBLIC NUISANCE

87.   Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

88.   Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety, and comfort of the general public and Plaintiffs, causing inconvenience and annoyance.

89.   Monsanto's intentional, negligent, and reckless acts and omissions have created widespread contamination of property with PCBs.

90.   By their conduct, Monsanto violated and continues to violate public rights and rights of the community at large to a clean and unpolluted natural environment and school buildings.

91.   The presence of PCBs interferes with Plaintiffs' use and/or enjoyment of their property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

92.   Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any property where PCBs were used.

93.   As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

## FIFTH CAUSE OF ACTION

### PRIVATE NUISANCE

94.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding

         paragraphs as if fully restated in this count.

95.     Plaintiffs' school buildings and grounds have been contaminated with PCBs.

96.     The presence of PCBs unreasonably interferes with Plaintiffs' use, benefit, and

         enjoyment of their property.

97.     Monsanto knew or, in the exercise of reasonable care, should have known that the

         manufacture and sale of PCBs would seriously and unreasonably interfere with the

         ordinary comfort, use, and enjoyment of any property where PCBs were used.

98.     Monsanto's intentional, negligent, and reckless acts and omissions have contaminated

         Plaintiffs' property with PCBs.

99.     As a direct and proximate result of Monsanto's creation of a private nuisance, Plaintiffs

         have suffered, and continue to suffer, property damage requiring investigation,

         remediation, and monitoring costs to be determined at trial.

## SIXTH CAUSE OF ACTION

### TRESPASS

100.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding

         paragraphs as if fully restated in this count.

101.    Plaintiffs are the owners, operators, and/or actual possessors of real property and

         improvements used for schools in the District.

102.    Monsanto manufactured, distributed, marketed, and promoted PCBs with the actual

         knowledge and/or substantial certainty that PCB-containing products would, through

normal use, release PCBs that would migrate onto adjacent surfaces, causing property contamination.

103.    Monsanto negligently, recklessly, and /or intentionally produced and marketed PCBs in a manner that caused PCBs to contaminate Plaintiffs' property.

104.    As a direct and proximate result of Monsanto's trespass, Plaintiffs have suffered and continue to suffer property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Violation of the Massachusetts Oil and Hazardous

### Material Release Prevention and Response Act

105.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

106.    By committing the acts alleged in this complaint, Monsanto has acted in the capacity of a person who (a) by contract, agreement, or otherwise, directly or indirectly, arranged for the transport, disposal, storage or treatment of hazardous material to or in a site or vessel from or at which there is or has been a release or threat of release of hazardous material; (b) directly, or indirectly, transported any hazardous material to transport, disposal, storage or treatment vessels or sites from or at which there is or has been a release or threat of release of such material; and/or (c) otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, as defined by M.G.L.A. 21E § 5(a)(3)-(5).

107.    Monsanto has directly and proximately caused and continues to cause significant damage to Plaintiffs and Plaintiffs' property.

108.  Monsanto is strictly liable to Plaintiffs for damage to real property caused by the release or threatened release of PCBs pursuant to M.G.L.A. 21E § 5(a).

109.  As a direct and proximate result of Monsanto's acts, Plaintiffs have suffered and continue to suffer property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1.  Compensatory damages according to proof including, but not limited to:

    (a)  the costs of investigating, sampling, testing, and assessing the extent of PCB contamination on Plaintiffs' properties;

    (b)  the costs of removing PCBs and PCB-containing materials from Plaintiffs' properties;

    (c)  the costs of informing parents and community members about the efforts to remove PCBs from schools.

2.  Punitive damages;

3.  Litigation costs and attorney's fees as provided by M.G.L.A. 21E § 15.

4.  Pre-judgment and post-judgment interest;

5.  Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial.

Dated:    May 7, 2014

/s/ *Richard M. Sandman*
Richard M. Sandman
RODMAN, RODMAN & SANDMAN, P.C.
442 Main Street, Suite 300
Malden, MA 02148-5122
Telephone:  (781) 322-3720


/s/ *Scott Summy*
Scott Summy (subject to Admission Pro Hac Vice)
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone:  (214) 521-3605


/s/ *Robert J. Gordon*
Robert J. Gordon (subject to Admission Pro Hac Vice)
WEITZ & LUXENBERG, P.C.
700 Broadway
New York, NY 10003
Telephone: (212) 558-5505


Attorneys for Plaintiffs