# United States Court of Appeals
## For the First Circuit

---

No. 17-1461

TOWN OF WESTPORT,

Plaintiff, Appellant,

WESTPORT COMMUNITY SCHOOLS,

Plaintiff,

v.

MONSANTO COMPANY; SOLUTIA, INC.; PHARMACIA CORPORATION,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

---

Before

Lynch, Stahl, Barron,
Circuit Judges.

---

Carla Burke Pickrel, with whom Richard M. Sandman, Baron & Budd, P.C., and Rodman, Rodman & Sandman, PC, were on brief for appellant.

Thomas M. Goutman, with whom Richard L. Campbell, Kim Kocher and White and Williams LLP were on brief, for appellees.

---

December 8, 2017

---

LYNCH, **Circuit Judge**.  This is an appeal from the entry of judgment for the defendants in a products liability case brought by the plaintiff, Town of Westport ("Westport").  The defendants are Monsanto Company, Solutia, Inc., and Pharmacia Corporation (collectively "Pharmacia").  Westport filed suit under Massachusetts law against Pharmacia, seeking to recover the cost of remediating Westport Middle School ("WMS") after discovering polychlorinated biphenyls ("PCBs") -- chemicals that are hazardous above certain concentrations -- in the school building.

When WMS was built in 1969, the contractor, who is not a defendant in this suit, used caulk that contained PCBs.  Although Monsanto did not make the caulk at issue, it sold plasticizers -- a component of caulk -- to the third-party manufacturer who did.  Westport alleges that Pharmacia is liable for what it claims to be "property damage" caused by the "PCB contamination" at WMS.

The district court entered judgment against Westport on all alleged counts of tort liability.  On appeal, Westport challenges only the entry of judgment against its (1) breach of warranty and (2) negligent marketing claims.

We affirm the district court's grant of summary judgment.  Monsanto did not breach the implied warranty of merchantability because it was <u>not</u> reasonably foreseeable in 1969 that there was a risk PCBs would volatilize from caulk at levels requiring remediation -- that is, levels dangerous to human health.

And as a matter of state law, a negligent marketing claim cannot be maintained independent of a design defect claim on these facts.

## I. <u>Background</u>

Because this case comes to us following Pharmacia's motion for summary judgment, we recite the facts in the light most favorable to Westport.[1]

### A.   <u>Overview of PCB-Containing Plasticizers</u>

Monsanto began to manufacture and sell PCB mixtures, trademarked as Aroclors, in 1935.   Aroclors were a popular plasticizer -- an additive used in building materials to increase

---

[1]    As a threshold matter, we must resolve two outstanding motions which affect the content of the record before us.

(1) Westport asks us to reconsider its motion to supplement the record with two studies that it alleges Pharmacia improperly withheld during discovery.   In the alternative, Westport seeks to reverse the district court's entry of judgment and asks us to remand the case with instructions to allow these studies to be introduced.   We <u>deny</u> Westport's motion, which is too little, too late.   Westport's counsel waited nearly a month after Pharmacia produced these studies to file this motion.   In any case, Westport's counsel should have filed a Rule 60(b)(2) motion in the district court, which has far greater familiarity with the record than we do, but it did not.

(2) We <u>grant</u> Pharmacia's motion to strike a settlement agreement contained in the addendum to Westport's amended reply brief and all citations to it.   The settlement agreement was not presented to the district court, so Westport cannot include it in its appellate briefing.   <u>See</u> <u>Rosaura Bldg. Corp.</u> v. <u>Municipality of Mayaguez</u>, 778 F.3d 55, 64 (1st Cir. 2015) ("Appellate review concentrates on considering the factual record presented in the trial courts.").   The agreement is also irrelevant to our disposition of this case.

fluidity -- because they were viscous, thermally stable, and non-flammable.  By August of 1970, however, Monsanto pulled PCB-containing Aroclors from the market because of their environmental impact.

### 1.    Supply Chain and Warnings

Before August 1970, Monsanto sold PCB-containing Aroclors to formulators of building materials, who then incorporated them into various end products. For "major customers" and "major applications," Monsanto likely sold Aroclors in bulk, in 55-gallon drums.  Some of Monsanto's direct customers were companies that manufactured end products, such as paint and caulk, while others produced polymer components of end products.

Monsanto continually updated its direct customers with information about the chemical properties and health effects of its PCB mixtures.  For instance, the record includes Monsanto's technical bulletins for Aroclor plasticizers from 1943, 1955, 1966, and 1970.  These bulletins included information about the plasticizers' rate of vaporization, as well as warnings about their toxicity and environmental impact.

Beginning in 1937, Monsanto warned customers that experimental studies in animals showed that "prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion" would "lead to systemic toxic effects."  These warnings

were present in all subsequent technical bulletins. The bulletins also prescribed precautions for industrial workers, such as ventilation and protective gear.

In addition, Monsanto warned its customers about the environmental hazards of PCBs. In its March 1970 bulletin, Monsanto explicitly advised against certain uses of Aroclors:

> Some specific applications where the use of PCB should definitely be avoided are in paints and sealants for swimming pools, paints and waterproofing agents in silos and other buildings where food products for humans or animals are stored, and as a component of any container of wrapping used in packaging food products.

These warnings were only given to Monsanto's direct customers, and not to end users.

### 2. Studies of Health Effects

Between 1934 and 1972, Monsanto sponsored 300 studies on the health effects of PCB exposure through inhalation and skin contact. These included skin patch and inhalation tests, as well as studies of the long-term reproductive and toxicological effects of PCBs in lab animals. In 1938, one study showed that PCBs were linked to liver toxicity. However, a series of studies in the 1950s, sponsored by Monsanto, and conducted by Dr. Treon, demonstrated that "at ordinary temperatures," the hazard of inhaling PCBs from Aroclors "may well be slight or entirely

absent." These studies concluded that the Aroclors tested only volatilized at levels sufficient to cause adverse health effects in animals when they were heated to 100 degrees Celsius (212 degrees Fahrenheit).

Although Monsanto was not legally required to test the volatilization of PCBs from consumer end products that it did not manufacture -- such as paints and resins -- it sometimes did so. These studies only showed elevated levels of volatilization at room temperature from latex paints and resins. Specifically, Monsanto's U.S.-based research division and U.K.-based medical department conducted at least three studies on the volatilization of PCBs from latex paints between 1952 and 1955. Around that time, one of Monsanto's clients, Dow Chemicals, had expressed interest in using Aroclors in its latex paints.

Monsanto's paint studies revealed that air samples collected from rooms covered in latex paint containing Aroclors, with temperatures between 70 and 100 degrees Fahrenheit, contained elevated PCB concentrations (above 0.15 mg per cubic meter) that persisted for one month (the duration of the study). Based on these findings, in 1953, Monsanto U.S. recommended against incorporating Aroclors into latex paints for indoor use. Monsanto U.K. later followed suit by recommending that the company continue to manufacture paints "based on chlorinated rubber" and

"to sell Aroclors for production of paints intended for exterior application," but to "discontinue sale of Aroclors for use in the manufacture of all other paints."

However, neither Monsanto nor any other research entity studied the rate of PCB volatilization from caulk. According to Westport's own experts, even though Monsanto had conducted weight-loss tests to ascertain the amount of Aroclor vaporization from caulk, the first study on the rate of PCB volatilization did not take place until "the early 2000s" -- more than three decades after WMS was constructed in 1969. And there are still no studies to date that establish PCBs volatilize from caulk at levels harmful to human health.

### 3.  Legislative Response

Six years after Monsanto removed PCB-containing Aroclors from the market, Congress enacted the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601, et. seq., which prohibited (with limited exceptions) the manufacture and distribution of PCBs in commerce. Id. § 2605(e)(2). The TSCA authorized the Environmental Protection Agency ("EPA") to implement specific regulations regarding PCB use and disposal. See id.

Following this authorization in 1976, the EPA promulgated regulations which required entities to obtain an exemption for the continued use of PCBs in a non-enclosed manner

at concentrations above 50 parts-per-million. See 40 C.F.R.
§ 761.20(c)(1). As justification for its decision, the agency
pointed to, inter alia, "the well-documented human health and
environmental hazard of PCB exposure, [and] the high probability
of human and environmental exposure to PCBs and PCB Items from
manufacturing, processing, or distribution activities." Id.
§ 761.20.

B.    Construction and Remediation of WMS

When WMS was built in 1969, Congress had yet to pass the
TSCA, the EPA did not exist, and Aroclors were still on the market.
The builders of WMS used caulk -- a construction material made up
of plasticizers, resin, fillers, and other additives -- that
contained PCBs. Monsanto supplied the two PCB mixtures at issue
-- Aroclor 1248 and 1254 -- to Product Research & Chemical
Corporation ("PRC"), which produced the caulk used at WMS.

Nearly four decades later, in 2010, Westport took part
in the Massachusetts State Building Authority's Green Repair
Program to renovate WMS's windows and roof. In preparation,
Westport tested the building for hazardous substances, including
PCBs. The tests indicated the presence of PCBs in the window
glazing, exterior window caulking, and interior door caulking.
Westport then embarked on a multi-million dollar remediation

project to remove the PCBs and brought suit against Pharmacia for the costs.

C.    District Court Proceedings

Westport filed this action on May 4, 2014, alleging seven counts of tort liability: (1) breach of the implied warranty of merchantability for defective design, (2) breach of the implied warranty of merchantability for failure to warn, (3) negligence, (4) public nuisance, (5) private nuisance, (6) trespass, and (7) violation of the Massachusetts Oil and Hazardous Material Release Prevention and Response Act.    Westport sought, inter alia, "compensatory damages . . . including, but not limited to" the "costs of investigating, sampling, testing, and assessing the extent of PCB contamination at Westport Middle School," and the costs of "removing PCBs and PCB-containing materials . . . from school property."

Pharmacia filed a partial motion to dismiss counts 4 through 7.  The district court granted the motion, and the parties proceeded to discovery on the remaining claims.  Westport alleged that it had spent between $3.1 and $3.7 million on its PCB remediation and subsequent PCB monitoring at WMS; its expert estimated that an additional $23.5 million was needed to "fully abate and encapsulate" the PCBs within WMS.

At the close of discovery, Pharmacia (1) moved in limine to exclude the testimony of Westport's experts, and (2) moved for summary judgment on all counts, or in the alternative, for partial summary judgment on Westport's damages claims. The district court entered judgment against Westport on all of its claims and denied the motion in limine and motion for partial summary judgment as moot.[2] On appeal, Westport challenges the district court's entry of judgment against count 2 (breach of the implied warranty of merchantability for failure to warn), and count 3 (negligence). Westport does not challenge the entry of judgment against Count 1 (design defect).

## II. Discussion

We review de novo the district court's entry of judgment. Pac. Indem. Co. v. Deming, 828 F.3d 19, 22 (1st Cir. 2016). Summary judgment is appropriate when the "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2016). A "genuine" issue of "material fact" only exists "if a reasonable factfinder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Cortés-Irizarry v. Corporación Insular de Seguros, 111 F.3d 184, 187 (1st Cir. 1997). Applying

---

[2]    The district court did strike a portion of the testimony of Westport's expert, Dr. Matson. See infra note 6.

this standard, we find that Westport failed to raise a genuine dispute as to the merits of its breach of warranty claim or its negligence claim.

## A.   Breach of the Implied Warranty of Merchantability

In order to establish a breach of the implied warranty of merchantability under Massachusetts law, a plaintiff must demonstrate that the product was "defective and unreasonably dangerous" for the "ordinary purposes" for which it was "fit," at the time that it left the supplier's hands. Evans v. Lorillard Tobacco Co., 990 N.E.2d 997, 1010 (Mass. 2013) (quoting Haglund v. Philip Morris, Inc., 847 N.E.2d 315, 322 (Mass. 2006)). A product can be unreasonably dangerous if the supplier fails to "reasonably . . . warn of the product's foreseeable risks of harm." Id. (emphasis added). This includes risks that were "reasonably foreseeable" at the time of sale, or that could have been "discovered by way of reasonable testing before marketing the product." Vassallo v. Baxter Healthcare Corp., 696 N.E.2d 909, 923 (Mass. 1998).

Westport and Pharmacia disagree about two aspects of the foreseeability analysis: (1) what specific risk of harm

- 11 -

Pharmacia's duty to warn encompassed, and (2) whether that risk was reasonably foreseeable or discoverable in 1969.

    1.   <u>Foreseeability Standard</u>

        Westport argues that, because it is bringing a claim for property damage, the correct inquiry is whether, as of 1969, it was foreseeable that there was a risk PCBs would volatilize out of caulk, <u>not</u> whether they would do so at levels harmful to human health.  To support its position, Westport cites a series of cases that purportedly define property damage without reference to a requisite level of contamination.

        But Westport misses the point.[3]  The district court did not hold that a property damage claim can only be brought when there is a risk to human health.  It merely ruled that the PCB contamination <u>in this case</u> needed to rise to a level requiring

---

     [3]    The cases Westport cites only deal with statutory or contractual remedies for property damage.  <u>See, e.g.</u>, <u>Essex Ins. Co.</u> v. <u>BloomSouth Flooring Corp.</u>, 562 F.3d 399, 406 (1st Cir. 2009) (holding that because odors can "consitute physical injury to property under Massachusetts law," they qualify as property damage under Essex's insurance policy); <u>Guaranty-First Trust Co.</u> v. <u>Textron, Inc.</u>, 622 N.E.2d 597, 597 (Mass. 1993)(addressing whether lost rent is compensable under the Massachusetts Oil and Hazardous Material Release Prevention Act); <u>Clean Harbors Envtl. Servs. Inc.</u> v. <u>Bos. Basement Techs., Inc.</u>, 916 N.E.2d 406, 409-10 (Mass. App. Ct. 2009) (interpreting the scope of an insurance policy's exclusion provision for property damage).  They are inapposite here because Westport is bringing a common law claim.

remediation -- that is, a level harmful to human health -- in order to qualify as property damage.

This makes sense.  To make out a property damage claim under Massachusetts law, Westport must demonstrate that the level of PCB contamination at WMS decreases the school's fair market value or necessitates remediation.  Cf. Guaranty-First Trust Co., 622 N.E.2d at 599 ("At common law, '[t]he general rule for measuring property damage is diminution in market value.' However, '[i]f the injury is reasonably curable by repairs, the expense of repairs, if less than the diminished market value, is the measure of recovery.'" (alterations in original) (internal citations omitted)).

Only PCB contamination levels sufficient to pose a health risk warrant remediation.[4]  Westport itself admits that "the presence of PCBs would not be considered 'contamination' if they were benign substances."  Given that PCBs are "invisible to the naked eye," and "lack a characteristic odor or appearance to alert users of their presence," their only deleterious effect is their potential harm to health.  In other words, no remediation is

---

[4]    Westport disputes this by arguing that it was legally compelled to remove the PCBs at WMS.  But whether the remediation was required by EPA regulations or the TSCA is a causation issue that we need not address here.  It has no bearing on what harms Monsanto should have foreseen, and warned its customers about, in 1969.  Indeed, the TSCA was not enacted until 1976.

necessary -- and hence, no property damage results -- unless the PCB contamination in a building poses an actual health risk.

Accordingly, the district court applied the correct standard of foreseeability in this case: whether Monsanto should have reasonably known, in 1969, that there was a risk PCBs would volatilize out of caulk at levels harmful to human health.

### 2.    Evidence Supporting Summary Judgment

Westport further contends that, even if the district court's standard of foreseeability is correct, the evidence on record is sufficient to defeat summary judgment. Specifically, Westport argues that because PCBs were known, as of 1969, to (1) cause adverse health effects, and (2) volatilize from paints and resins at elevated levels, there is a genuine dispute as to whether it was reasonably foreseeable that PCBs in caulk would pose a health risk. We disagree based on the evidence presented.

While "[i]t is well-settled that a judge must not engage in making credibility determinations or weighing the evidence at the summary judgment stage," "it is equally clear that judges cannot allow conjecture to substitute for the evidence necessary to survive summary judgment." Pina v. Children's Place, 740 F.3d 785, 802 (1st Cir. 2014). A "nonmovant [who] bears the ultimate

- 14 -

burden of proof" must provide "definite, competent evidence."
Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).

Here, Westport failed to proffer any scientific studies evidencing a risk that PCBs volatilize from caulk at harmful concentrations when inhaled, much less that such a risk was known to Pharmacia before 1969.[5] Nor did Westport point to other evidence in the record supporting such a conjecture. In fact, Westport's own experts conceded that there is no scientific literature to date demonstrating that PCBs volatilize from caulk at a rate that is hazardous to human health.

Still, Westport asserts that, because PCBs were known to volatilize from paints and resins at elevated levels in 1969, it should have been reasonably foreseeable then that there was a risk they would volatilize from caulk at harmful levels. That does not follow. The risk that PCB-containing caulk would cause adverse health effects could not have been "reasonably foreseeable" in 1969 given that the existence of such a risk

---

[5]     Westport's expert, Dr. Matson, states in his expert report that certain studies "demonstrated that Monsanto should have understood that plasticizers volatilize from polymers, regardless of whether the polymer is a thin coating like paint or a thicker material like joint sealant." But those studies only suggest that there is a basis for concluding PCBs volatilize from caulk, not that there was a risk they would do so at levels that pose a health risk. Simply put, Westport fails to provide any basis for concluding that PCBs volatilize from caulk, paints, and resins at the same rate.

remains unverified by scientific studies today.  Although we draw all reasonable inferences in Westport's favor, we will not "draw <u>unreasonable</u> inferences or credit bald assertions."  <u>Cabán Hernández</u> v. <u>Philip Morris USA, Inc.</u>, 486 F.3d 1, 8 (1st Cir. 2007).

In fact, the evidence unequivocally supports the conclusion that the risk PCBs would volatilize from caulk at harmful levels was <u>not</u> reasonably foreseeable in 1969.[6]  Westport's own expert, Dr. Dorman, conceded that there were no scientific studies evidencing, or even suggesting, that the rate of PCB volatilization from paints could, let alone should, be extrapolated to caulk.  And Westport provides no evidence to the contrary.

On the other hand, the record is replete with evidence establishing that it was reasonable for Monsanto to conclude that the paint studies were not applicable to caulk.  For instance, one

---

[6]   The only evidence to the contrary is the expert report by Dr. Matson, which stated that "Monsanto produced and sold PCB-containing Aroclors as plasticizers for polysulfide sealants and other building materials . . . knowing that volatilization of PCBs would result in PCB contamination in indoor air . . . ."  The district court correctly excluded this testimony, however, because Dr. Matson cannot testify to Monsanto's specific knowledge or motivations.  <u>See</u> <u>In re Toyota Motor Corp.</u>, 978 F. Supp. 2d 1053, 1087 (C.D. Cal. 2013) (holding that "Toyota's knowledge (or lack thereof) is not a proper subject for expert testimony, and it must be established (if at all) by other evidence").

Case 1:14-cv-12041-DJC   Document 247   Filed 12/08/17   Page 17 of 21

of Pharmacia's witnesses, Dr. Kaley, testified that in general, incorporating PCBs into a plastic matrix such as caulk would "significantly reduce th[eir] vapor pressures," leading to lower volatilization.  And Westport's own expert, Dr. Matson, gave ten factors that affect the rate at which PCBs volatilize from different building materials.  These factors, which include "other ingredients in the matrix," "the thickness of the product," "air temperature," and "the surface temperature on which the product is sitting," all point to the rate of PCB volatilization differing between paint and caulk.

As such, the district court did not engage in improper "credibility determinations or weighing [of] the evidence," Pina, 740 F.3d at 802, when it found what Westport's "reliance on . . . inferences" was insufficient to defeat summary judgment. Town of Westport v. Monsanto Co., No. 14-12041, 2017 WL 1347671, at *7 (D. Mass. Apr. 7, 2017).  The district court merely determined, as it should, that a reasonable fact-finder could not rule for Westport because there is no evidence in the record, from either 1969 or the present day -- aside from Westport's own conjecture -- that PCBs volatilize from caulk at levels harmful to human health.  Indeed, Westport's own experts have conceded this point.

Accordingly, the district court correctly entered judgment against Westport's breach of warranty claim for failure to warn.

### 3.  Post-Sale Failure to Warn

Westport also raises a related breach of warranty claim: that Pharmacia violated its post-sale duty to warn.  To succeed on such a claim, Westport must establish that (1) Monsanto "kn[ew] or reasonably should have known of product dangers discovered post-sale," (2) "a reasonable person in [Monsanto's] position would provide a warning," (3) "those to whom a warning might be provided can be identified," and (4) the warning can be "effectively communicated" to them.  Lewis v. Ariens Co., 751 N.E.2d 862, 866 (Mass. 2001) (quoting Restatement (Third) of Torts: Prods. Liability § 10(b)(2),(3) (1998)).

The district court entered judgment against this claim because Westport failed to establish the third criterion: that WMS was an identifiable end user.  Westport nevertheless argues that because (1) it was able to identify PRC as the formulator that made the caulk used at WMS, and (2) Monsanto maintained a list of direct customers, including PRC, there is a genuine issue of

triable fact about whether Monsanto could have identified WMS as an end user.

We agree with the district court. Although Westport is entitled to the benefit of all reasonable inferences, it cannot rest on "conclusory allegations, improbable inferences, [or] unsupported speculation" to defeat a motion for summary judgment. McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). That Monsanto maintained a list of direct customers has no bearing on whether it could have identified all end users. Given Monsanto's complex supply chain, tracing the caulk used at WMS back to PCR (based on documents containing WMS's specifications and communications from WMS's contractor) is not the same as being able to identify WMS as an end user in the first place. As such, Westport's assertion that WMS was an identifiable end user is mere speculation. The district court correctly entered judgment against Westport's post-sale failure to warn claim.

## B. Negligent Marketing

Westport also contests the entry of judgment against its negligent marketing claim.[7] But no court, applying Massachusetts law, has ever explicitly held that a negligent marketing claim can be maintained independent of a design defect claim. Commonwealth

---

[7]    Because Pharmacia only has a duty to warn of foreseeable dangers, our ruling on foreseeability also disposes of Westport's negligence claim for failure to warn.

courts have only opined that absent a design defect, a manufacturer
<u>might</u> still be liable if it intentionally targeted children.  <u>Cf.</u>
<u>Killeen</u> v. <u>Harmon Grain Prods., Inc.</u>, 413 N.E.2d 767, 772 (Mass.
App. Ct. 1980) (reversing judgment for plaintiff on negligent
marketing grounds but noting, in dicta, that a manufacturer's
liability <u>might</u> be based on the marketing of a product if it was
"calculated to induce direct purchases by children or others whose
use of the product would involve unreasonable risk of injury").
Here, Westport does not challenge the entry of judgment against
its design defect claim.  And Aroclors were clearly not marketed
in a manner to "induce direct purchases by children." <u>Evans</u>, 990
N.E.2d at 1025.  So, Westport cannot maintain its cause of action
for negligent marketing.

The only cases that Westport cites to support its
contrary position, <u>Yakubowicz</u> v. <u>Paramount Pictures Corp.</u>, 536
N.E.2d 1067 (Mass. 1989), and <u>Evans</u>, 990 N.E.2d 997, are
inapposite.  <u>Yakubowicz</u> did not deal with negligent marketing.
<u>See</u> 536 N.E.2d at 1072 (holding that Paramount was not liable, on
a failure to warn theory, for a fatal assault committed by a teen
who had watched, and was allegedly inspired by, Paramount's violent
film).  And <u>Evans</u> vacated a judgment based on negligent marketing,
because of "the absence of guidance" to the jury "as to the meaning
of negligent marketing," and the fact that the product at issue

Case 1:14-cv-12041-RJC    Document 247    Filed 12/08/17    Page 21 of 21

-- cigarettes -- was marketed to both adults and children.  Id. at 1025.

That ends the matter.  Westport does not have a cause of action for negligent marketing.

### III. Conclusion

For the foregoing reasons, we affirm the district court's entry of judgment against Westport's breach of warranty and negligence claims.  Costs are awarded to Pharmacia.